IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOSE LUIS CEPEDA-CORTES, JR.,
        Movant,

v.

UNITED STATES OF AMERICA,
        Respondent.

NO.   4:19-CV-934-Y
       (4:14-CR-151-Y)

### **RESPONSE TO MOTION UNDER 28 U.S.C. § 2255**

Respectfully submitted,

Erin Nealy Cox
United States Attorney

*/s/ Gail Hayworth*

Gail Hayworth
Assistant United States Attorney
Texas Bar No. 24074382
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone:  (214) 659-8600
gail.hayworth@usdoj.gov

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

RESPONSE TO MOTION UNDER 28 U.S.C. § 2255 ....................................... 1

STATEMENT OF THE CASE ........................................................................ 1

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE FACTS ...................................................................... 3

ARGUMENT AND AUTHORITIES ................................................................ 7

1. Cepeda fails to show that his trial counsel provided ineffective assistance. ....................................................................................... 10

  A. Cepeda's claim that his trial counsel failed to investigate is conclusory (Ground Two). ................................................. 10

  B. Cepeda's claim that counsel performed deficiently by failing to call a number of witnesses is conclusory (Grounds One and Five). ....... 12

    i. Bob McLean, Gilbert Garza, and Hugo Resendez ............... 13

    ii. Elena Gonzalez ...................................................... 15

    iii. Miriam Cepeda and Laura Lynette Having .......................... 17

    iv. Joey Cepeda ........................................................ 20

  C. Cepeda fails to show that he was prejudiced by his counsel's purported failure to advise him of his rights to testify and to call him to the stand (Ground Eight). ............................................. 21

  D. Cepeda's claim that counsel failed to adequately cross-examine Campano is conclusory (Ground Four). .......................................... 23

  E. Cepeda fails to show a conflict of interest with his trial counsel (Ground Three). ................................................................. 24

F.      Cepeda fails to show prejudice in his counsel's purported failure to properly prepare Dr. Al Yonovitz to be qualified as an expert witness (Ground Nine). .................................................................. 26

G.      Cepeda's assertion regarding counsel's stipulation with the government is wholly unsupported by the record, and, in any event, Cepeda fails to show prejudice (Ground Six). ................................. 29

2.      Cepeda fails to show that his appellate counsel provided ineffective assistance (Ground Seven). .......................................................... 30

3.      Cepeda's mere speculation that there "may" have been prosecutorial misconduct falls far short of showing entitlement to Section 2255 relief (Ground 10). ............................................................................... 32

4.      Cepeda's actual-innocence claim does not provide an independent ground for relief (Ground 11). ................................................................... 34

CONCLUSION .............................................................................................. 36

CERTIFICATE OF SERVICE ......................................................................... 37

# TABLE OF AUTHORITIES

**Federal Cases**                                                                 **Page(s)**

*Alvord v. Wainwright*, 469 U.S. 956 (1984) ....................................................................... 21

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) ......................................................... 33

*Cepeda-Cortes v. United States*, 139 S. Ct. 467 (2018) .................................................. 1, 7

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ........................................................................... 9

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ............................................ 29

*Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009) .................................................... passim

*Delgado v. United States*, No. 09-CV-50, 2010 WL 582551 (S.D. Tex. Feb. 10, 2010) .. 23

*Gonzalez v. United States*, 553 U.S. 242 (2008) ............................................................... 21

*Gray v. Greer*, 800 F.2d 644 (7th Cir. 1986) ..................................................................... 31

*Gray v. Lucas*, 677 F.2d 1086 (5th Cir. 1982) ................................................................... 27

*Herrera v. Collins*, 506 U.S. 390 (1993) ............................................................................ 34

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................................................... 31

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ................................................................... 33

*Lincecum v. Collins*, 958 F.2d 1271 (5th Cir. 1992) .................................................... 13, 14

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) ...................................................................... 35

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) ..................................................... 9, 11, 25

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................................................ 9

*Palmer v. Hendricks*, 592 F.3d 386 (3d Cir. 2010) ........................................................... 22

*Premo v. Moore*, 562 U.S. 115 (2011) .................................................................................. 9

*Roberson v. United States*, No. 3:14-CV-485, 2015 WL 1525007
    (N. D. Tex. Apr. 2, 2015) .................................................................................................. 34

*Rock v. Arkansas*, 483 U.S. 44 (1987) ................................................................................ 21

iv

**Federal Cases, continued**                                            **Page(s)**

*Sayre v. Anderson*, 238 F.3d 631 (5th Cir. 2001) ...................................... 23

*Smith v. Robbins*, 528 U.S. 259 (2000) ....................................................... 30, 31

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................ 8, 9, 27

*Tucker v. Johnson*, 242 F.3d 617 (5th Cir. 2001) ..................................... 32

*United States v. Addonizio*, 442 U.S. 178 (1979) ..................................... 7

*United States v. Asibor*, 109 F.3d 1023 (5th Cir. 1997) .......................... 32

*United States v. Capua*, 656 F.2d 1033 (5th Cir. Unit A 1981) .............. 7, 8

*United States v. Frady*, 456 U.S. 152 (1982) ........................................... 8

*United States v. Franks*, 397 F. App'x 95 (5th Cir. 2010) ....................... 15, 16

*United States v. Goodley*, 183 F. App'x 419 (5th Cir. 2006) ................... 11

*United States v. Green*, 882 F.2d 999 (5th Cir. 1989) .............................. 10, 25

*United States v. Hughes*, 635 F.2d 449 (5th Cir. Unit B Jan. 1981) ........ 9, 10

*United States v. Irby*, 103 F.3d 126, 1996 WL 731500 (5th Cir. Nov. 26, 1996) ............ 23

*United States v. Ledezma-Cepeda*, 894 F.3d 686 (5th Cir. 2018) .......... 1, 3, 7, 31

*United States v. Moreno-Gonzalez*, 662 F.3d 369 (5th Cir. 2011) ......... 31

*United States v. Placente*, 81 F.3d 555 (5th Cir. 1996) ........................... 7, 8

*United States v. Reed*, 719 F.3d 369 (5th Cir. 2013) ............................... 10

*United States v. Sierra*, No. 05-CV-101, 2010 WL 323564 (E.D. La. Jan. 20, 2010) ...... 34

*United States v. Stewart*, 207 F.3d 750 (5th Cir. 2000) ........................... 9

*Whitfield v. Davis*, No. 4:15-CV-1876, 2016 WL 3166852 (S.D. Tex. June 7, 2016) ..... 24

*Whittington v. United States*, No. DR-08-CA-79, 2009 WL 10718750
   (W.D. Tex. July 29, 2009) ....................................................................... 34

*Zuck v. Alabama*, 588 F.2d 436 (5th Cir. 1979) ...................................... 24

**Federal Statutes and Rules**                                                    **Page(s)**

Fed. R. Evid. 702 ................................................................................................ 28

Fed. R. Evid. 702(a) ........................................................................................... 29

## RESPONSE TO MOTION UNDER 28 U.S.C. § 2255

The Court should deny Cepeda's motion to vacate, set aside, or correct his convictions under 28 U.S.C. § 2255 because the various claims he raises are conclusory and/or meritless.

## STATEMENT OF THE CASE

After a two-week trial, a jury found Cepeda guilty of interstate stalking and aiding and abetting, conspiracy to commit murder for hire, and tampering with documents or proceedings.  Cepeda appealed, and the Fifth Circuit affirmed his convictions.  *United States v. Ledezma-Cepeda*, 894 F.3d 686 (5th Cir. 2018).  After the Supreme Court denied Cepeda's petition for writ of certiorari, *Cepeda-Cortes v. United States*, 139 S. Ct. 467 (2018), he timely filed his first Section 2255 motion.  (CV No. 1.)[1]

## STATEMENT OF THE ISSUES

Cepeda raises the following claims:

1.  His trial counsel, Robert H. Rogers, provided ineffective assistance of counsel by:

    a.  Failing to investigate (Ground Two);

    b.  Failing to call Bob McLean, Gilbert Garza, Hugo Resendez, Elena Gonzalez, Miriam Cepeda, Laura Cepeda, and Joey Cepeda as witnesses for the defense (Grounds One and Five);

---

[1] "CR No. __" refers to the docket of the criminal proceeding, *United States v. Ledezma-Cepeda, et al.*, No. 4:14-CR-151-Y.  "CV No. __" refers to the docket of this Section 2255 action.  "GX __" refers to the government's trial exhibits. Other documents will be referenced by their abbreviated title.

c.   Failing to call Cepeda to testify in his own defense (Ground Eight);

d.   Failing to adequately cross-examine the government's witnesses (Ground Four);

e.   Having a "conflict of interest" with Cepeda (Ground Three);

f.   Failing to prepare proposed defense expert Dr. Al Yonovitz to be qualified as an expert witness (Ground Nine); and

g.   Telling Cepeda's family that he and the government had stipulated that Cepeda played a minor role in the alleged conspiracy and no further defense witnesses were needed (Ground Six);

2.   His appellate counsel, William Reagan Wynn, provided ineffective assistance because he "should have raised issues related to the trial court overruling objections to inadmissible 404(b) evidence of extraneous offenses and sufficiency of the evidence" (Ground Seven);

3.   "There may exist prosecution misconduct by the government" because Cepeda purportedly has "newly discovered evidence from a witness that [Campano] admitted he lied to the jury about [Cepeda's] involvement in each count of the indictment" (Ground Ten); and

4.   Cepeda is "actually innocent" because "a review of post-trial FBI 302s supplied to Defense counsel" "indicate another cartel/or individuals not associated with defendant carried out the murder in this case" (Ground Eleven).

2

## STATEMENT OF THE FACTS[2]

Cepeda's cousin and codefendant, Jesus Ledezma-Cepeda (Ledezma), was a member of Grupo Rudo, a collection of drug-cartel members and corrupt police officers in San Pedro Garza Garcia, Nuevo Leon, Mexico.  Though not a cartel member, Ledezma was friends with multiple members of the Beltran-Leyva Organization, a drug cartel led by Hector Beltran-Leyva.  Ledezma also held a day job as a private investigator focusing primarily on tracking cheating spouses and people suspected of theft.  His son, Jesus Ledezma-Campano (Campano) occasionally helped him with those jobs.

Beltran-Leyva cartel leader Rodolfo Villareal-Hernandez (Gato) asked Ledezma to track down Juan Guerrero-Chapa (Chapa), who Gato believed was responsible for his father's death.  The search took Ledezma to the United States, where he recruited Cepeda to assist.  The two eventually traveled to Florida, where, together with a few others, they trailed Chapa's brother, Armando.  Cepeda rented a house for the group close to Armando's gated community; the crew monitored his vehicles with GPS trackers, and they conducted in-person surveillance around Armando's house for a few months.

When the Florida search proved fruitless, Ledezma and Cepeda flew back to Texas, where Cepeda discovered a Grapevine, Texas, property-tax record for Chapa's sister-in-law, Laura Martinez.  After reporting back to the cartel leader, the crew headed to Grapevine and placed a tracker on Martinez's car.  Cepeda then rented an apartment

---

[2] Unless otherwise stated, the facts are taken from the Fifth Circuit's opinion, which affirmed this Court's judgment.  *Ledezma-Cepeda*, 894 F.3d at 687-89.

close to Martinez's house, where Ledezma and Campano lived and where Cepeda occasionally joined them.

Tracking Martinez proved useful—she led the trio to Chapa.  Once Cepeda confirmed Chapa's address via a property-record search, Campano put surveillance cameras in front of the house and around the neighborhood.  Ledezma and Campano also placed GPS trackers on Chapa's vehicles.  Cepeda provided Ledezma and Campano with car decals to disguise their vehicles and deflect attention.  The group then monitored Chapa's comings and goings, and Ledezma sent Gato regular reports and pictures of Chapa and his family.

After a few weeks, Gato sent two hitmen to Texas.  Ledezma and Campano met them at a hotel outside Forth Worth to give them a GPS tracking device.  Cepeda returned home to the Rio Grande Valley, and Ledezma and Campano remained in Grapevine.

The day of the murder, Cepeda was in his hometown of Edinburgh, Texas, preparing for a trip to California with his girlfriend.  Ledezma and Campano were in the Grapevine area keeping close tabs on Chapa at Gato's direction.  In the evening they followed Chapa and his wife to the upscale Southlake Town Square shopping center, where they parked and continued to keep watch.  After about an hour, a white SUV stopped near Chapa's vehicle.  A passenger with a hoodie obscuring his face got out, walked to the passenger side of Chapa's vehicle, and fired six shots, killing Chapa.

Gato directed Ledezma and Campano to destroy their cell phones and any other evidence.  The two men did so, then moved out of their Grapevine apartment and

4

returned to the Rio Grande Valley in separate cars and eventually to Mexico. (CR No. 434 at 34.) About two weeks after the murder, someone on Cepeda's business computers searched "obstruction of justice," how to wipe a computer hard drive, and Blackline GPS privacy policies. Over the next year, the computers' hard drives were wiped multiple times. Cepeda also wiped his cell phone history.

Later that year, Cepeda visited Ledezma in Mexico. While there, Cepeda requested more money for his part in the investigation. Ledezma, Campano, and Cepeda also discussed a potential alibi by which they would place the blame on Ledezma and say that Campano and Cepeda had merely been helping him because of his poor health and inability to speak English.

More than a year after Chapa's murder, agents arrested Ledezma and Campano as they entered the United States. Cepeda was arrested shortly thereafter. A grand jury indicted all three for interstate stalking and aiding and abetting interstate stalking in violation of 18 U.S.C. § 2261A, and conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958. Cepeda was also indicted for tampering with documents or proceedings in violation of 18 U.S.C. § 1512(c)(1). Campano negotiated a plea agreement, pleading guilty to interstate stalking and agreeing to testify against Ledezma and Cepeda at trial.

The government filed a notice of intent to use Federal Rule of Evidence 404(b) evidence linking Ledezma to at least nine additional murders over five years and showing that he had been actively tracking two other persons at the time of his arrest. In response,

5

Cepeda, represented by retained counsel Robert H. Rogers and two other attorneys,[3] filed his first motion for severance, arguing that the spillover effect from evidence of multiple drug cartel murders would unduly prejudice him and deny him the right to have the jury weigh only the evidence against him.  The district court denied Cepeda's motion.  But at a pre-trial conference, the court granted Cepeda's request for a motion in limine requiring the government to approach the bench before introducing evidence of Ledezma's extraneous offenses.

At trial, Ledezma raised a duress defense.  He admitted to every fact the government had proven but claimed he had to follow Gato's instructions to avoid death or serious harm to himself and his family.  Cepeda's defense likewise admitted to the majority of the evidence against him but contended that he lacked the mental state for stalking and murder for hire.  He claimed he had been duped by Ledezma—that, during the investigation, Cepeda believed Chapa was a white-collar criminal who had stolen money from Mexican banks and that the investigation was legitimate.

The trial lasted about two weeks.  After deliberating for one day, the jury found Ledezma and Cepeda guilty of interstate stalking and conspiracy to commit murder for hire and Cepeda guilty of tampering with documents or proceedings.  This Court sentenced both to life imprisonment.

On direct appeal, Cepeda, represented by retained counsel William Reagan Wynn, contended that this Court committed reversible error in denying his requests to sever.

---

[3] At this time, Cepeda was also represented by David Coody and J. Stephen Cooper.  (CR No. 25-28.)

6

Cepeda's main argument was that the jury likely considered the voluminous Rule 404(b) evidence about Ledezma against Cepeda and imputed "guilt by association." *Ledezma-Cepeda*, 894 F.3d at 690.  The Fifth Circuit rejected the argument, emphasizing that this Court "dispelled any scent of ambiguity or prejudicial inference by carefully and repeatedly instructing the jury, throughout trial, that it consider the Rule 404(b) evidence as admissible *only against Ledezma* and *only for limited purposes*." *Id.* at 691.  Cepeda filed a petition for certiorari review, which the Supreme Court denied on November 5, 2018.  *Cepeda-Cortes*, 139 S. Ct. at 467.  On November 4, 2019, Cepeda filed this motion to vacate, set aside, or correct his convictions under 28 U.S.C. § 2255, to which the government now responds.

## ARGUMENT AND AUTHORITIES

### Standard of Review

Under 28 U.S.C. § 2255, a prisoner may move the convicting court to vacate, set aside, or correct his conviction or sentence.  It provides four grounds for relief:  "(1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is 'otherwise subject to collateral attack.'"  *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) (citation omitted).

"It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  *United States v. Addonizio*, 442 U.S. 178, 184 (1979).  "Section 2255 does not offer recourse to all who suffer trial errors."  *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. Unit A

7

1981).  And it "may not do service for an appeal."  *United States v. Frady*, 456 U.S. 152, 165 (1982).  After conviction and the exhaustion or waiver of all appeals, the Court is "entitled to presume" that the prisoner "stands fairly and finally convicted."  *Id.* at 164.

Section 2255 is "reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and, would, if condoned, result in a complete miscarriage of justice."  *Capua*, 656 F.2d at 1037.  In other words, the "scope of relief under § 2255 is consistent with that of the writ of habeas corpus."  *Placente*, 81 F.3d at 558.

Ineffective-assistance-of-counsel claims are governed by the familiar *Strickland* test that requires the defendant to prove both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  First, the defendant must overcome the "strong presumption that counsel's conduct [was] within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (internal quotation marks and citation omitted).  "There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  *Id.*  The reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id.*  Counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable

8

adversarial testing process," but there is no "checklist" or "particular set of detailed rules" to evaluate counsel's performance. *Id.* at 688-89. "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 689.

Second, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694 (internal quotation marks and citation omitted). "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted).

Simply making "conclusory allegations" of deficient performance and prejudice is insufficient to meet the *Strickland* test. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000). The defendant must prove that counsel was deficient; it is not the government's burden to prove that counsel was competent. *See Premo v. Moore*, 562 U.S. 115, 121 (2011). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The claim fails if the prisoner does not satisfy either the deficient-performance or prejudice prongs. *United States v. Stewart*, 207 F.3d 750, 751 (5th Cir. 2000). And a court need not address both components if there is an insufficient showing on one. *Id.*

Section 2255 motions do not automatically require a hearing. *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. Unit B Jan. 1981); *see also* Rule 8 of the Rules Governing Section 2255 Proceedings. "When the files and records of a case make

manifest the lack of merit of a section 2255 claim, the trial court is not required to hold an evidentiary hearing." *Hughes*, 635 F.2d at 451.  A prisoner is not entitled to an evidentiary hearing on his Section 2255 motion unless he "presents independent indicia of the likely merit of his allegations." *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013).

**Discussion**

**1.     Cepeda fails to show that his trial counsel provided ineffective assistance.**

**A.     Cepeda's claim that his trial counsel failed to investigate is conclusory (Ground Two).**

Cepeda claims that his "[t]rial counsel did not effectively investigate material witnesses concerning facts that would contradict the government's witnesses and [Campano]," and "failed to follow up on the information initially received concerning the potential witness Elena Gonzalez."  (Mot. at 6.)  But his claims are conclusory and fail to satisfy the *Strickland* test.

As the Fifth Circuit has held, "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).  Here, Cepeda fails to identify what "material witnesses" should have been investigated or what a further investigation of those witnesses would have revealed.  Rather, he broadly claims that, if such witnesses had been investigated, Campano "would have been impeached and rebutted as to most of his testimony."  (Mot. at 6.)  But such broad allegations—which do not "allege with

specificity" (i) the witnesses' trial counsel should have investigated, (ii) what evidence a further investigation would have revealed, or (iii) how that evidence would have changed the outcome of the trial—show neither deficient performance nor prejudice under the *Strickland* test. *See United States v. Goodley*, 183 F. App'x 419, 423 (5th Cir. 2006) ("Because [movant] did not provide sufficient detail about what the foregone investigations might have revealed or how they might have altered the outcome of his trial, the district court correctly concluded that he failed to show that these foregone investigations met the performance component of the *Strickland* test."); *Miller*, 200 F.3d at 282 (holding that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding").

Additionally, Cepeda's assertion that his trial counsel failed to "follow up on the information initially received concerning the potential witness Elena Gonzalez" also fails to satisfy the *Strickland* test. First, Cepeda cannot prove the factual premise of his argument—i.e., that his trial counsel failed to follow up on the information received concerning Elena Gonzalez and her knowledge of victim Chapa. Indeed, the record indicates that counsel actually *did* try to follow up—as he instructed a private investigator to make inquiries, but was unable to contact Gonzalez by the time of trial. (CR No. 428 at 7.) As such, because he fails to prove his own factual premise, it follows that he cannot show deficient performance based on that factual premise.

Moreover, even assuming for the sake of argument that counsel did fail to follow up on the Gonzalez information, Cepeda fails to show prejudice, as he fails to show that such "follow up" would have led counsel to Gonzalez before trial. At a pretrial hearing,

11

Cepeda's trial counsel told the Court, "[w]e have not been able to contact Ms. Gonzalez yet", and "I don't know if that's [the address we have is] a good address."  (CR No. 428 at 7.)  The AUSA similarly stated that, in August 2015, the government did not know where Gonzalez was and that, as of April 20, 2016—days before trial—the government still did not know her location.  (CR No. 428 at 9, 20-21.)  Accordingly, because Cepeda fails to show a reasonable probability that Gonzalez could have been located prior to and during trial, he cannot show that his counsel's purported failure to follow up on the Gonzalez information affected the outcome of the trial.

> **B.**    **Cepeda's claim that counsel performed deficiently by failing to call a number of witnesses is conclusory (Grounds One and Five).**

Cepeda argues that his trial counsel performed deficiently when he failed to call Bob McLean, Gilbert Garza, Hugo Resendez, Elena Gonzalez, Miriam Cepeda, Laura Cepeda, and Joey Cepeda to testify as witnesses for Cepeda's defense at trial.  But for each of these proposed witnesses, Cepeda fails to make the required showing.

"This Court has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the movant must (1) name the witness, (2) demonstrate that the witness was available to testify and would have done so, (3) set out the content of the witness's proposed

testimony, and (4) show that the testimony would have been favorable to a particular defense.  *Id.*

### i.   Bob McLean, Gilbert Garza, and Hugo Resendez

With respect to Bob McLean, Gilbert Garza, and Hugo Resendez, Cepeda fails to show that these witnesses were available and would have testified at trial, the substance of their proposed testimony, or how their testimony would have been favorable to a particular defense.  Indeed, none of these proposed witnesses even submitted an affidavit. As such, Cepeda fails to show that his trial counsel acted deficiently by failing to call them as witnesses.  *See id.* (rejecting an uncalled-witness claim where the proposed witness's affidavit did not state that he was available to testify at trial, that he would have done so, or that he would have testified in accord with the opinions and conclusions stated in his affidavit); *Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir. 1992) (holding that "[a]bsent any concrete indication of the substance of the mitigating evidence his friends and family would have provided, the law is clear that an evidentiary hearing is not called for" and petitioner's habeas claim fails).

In an affidavit submitted by Cepeda's son, Joey Cepeda (Joey), Joey states that Garza was "a police officer in the McAllen community" who could have rebutted Campano's testimony that Chapa was found in Southlake "as a result of pictures and information provided by . . . Garza."  (Mot. at 54.)  But Joey's affidavit is poor evidence of what Garza would have testified to.  *See Lincecum*, 958 F.2d at 1280 ("[W]e are loathe to accept the self-serving statements of habeas counsel as evidence that other persons were willing and able to testify on [defendant's] behalf.").  And contrary to Joey's

13

assertions, Campano did not "testif[y] in trial [that] the three coconspirators found victim Chapa in Southlake, Texas, as a result of pictures and information provided by . . . Garza to . . . Cepeda." (Mot. at 54.)  Rather, Campano testified that the investigation moved to the Grapevine, Texas, area because of an email Cepeda sent to Ledezma regarding a property tax record for Chapa's sister-in-law. (CR No. 433 at 106-07; *see also* CR No. 435 at 48-49; GX 229.)  At no point in the trial was the name "Gilbert Garza" even mentioned.  Therefore, even assuming *arguendo* that Gilbert Garza could have and would have testified that he did not provide information to Cepeda that lead the defendants to the Southlake area, Cepeda fails to show how this testimony would have been favorable to his defense—as, contrary to his assertions, it would not have rebutted any of Campano's testimony.

In his affidavit, Joey further states that Hugo Resendez was an employee at Cepeda's Decals By Design shop.  He claims that Resendez "had information that . . . Ledezma and Campano were sophisticated and knowledgeable in their understanding and operation of computers and had frequent unsupervised access to . . . [Cepeda's] computers located at [his] business," and that "Campano and Ledezma operated and used it unbeknownst and unauthorized by [Cepeda]." (Mot. at 54-55.)  But once again, Joey's affidavit is not evidence of what Hugo Resendez knew and would have testified to. *See Lincecum*, 958 F.2d at 1280.  Moreover, even Joey's affidavit does not aver that Resendez was available to testify at trial and would have done so.  As such, Cepeda fails to show that his counsel performed deficiently by failing to call Resendez as a witness. *See Day*, 566 F.3d at 538.

14

Cepeda also fails to show prejudice.  Even assuming Resendez had knowledge of and was willing to testify to the statements made in Joey's affidavit, such testimony would have presumably been offered to suggest that Campano and Ledezma—not Cepeda—destroyed evidence on Cepeda's computers.  But Cepeda fails to show a reasonable probability that such testimony would have altered the outcome of the trial, given (1) the unrebutted evidence that Cepeda wiped his cell phone in the same month that data was deleted from his computers, (CR No. 436 at 138; CR No. 437 at 50, 59-60); (2) Cepeda's daughter's testimony that Cepeda told her he had destroyed files, (CR No. 439 at 176-77); and (3) the fact that even Joey's affidavit—which purports to state what another person knew and would have testified to—does not allege when Campano and Ledezma purportedly had unsupervised access to Cepeda's computers, let alone that they did so on the days when data was deleted.  *See United States v. Franks*, 397 F. App'x 95, 101 (5th Cir. 2010).  Accordingly, Cepeda fails to show that his counsel provided constitutionally ineffective assistance by not calling Resendez as a witness.

### ii.     Elena Gonzalez

Regarding Elena Gonzalez, Cepeda likewise fails to show that she was available and willing to testify at the time of trial.  To the contrary, as discussed above, the record shows that neither the government nor defense counsel was aware of Gonzalez's location leading up to and at the time of trial.  (CR No. 428 at 7, 9, 20-21.)  Cepeda likewise fails to show the substance of her proposed testimony or how that testimony would have made a difference at trial—as he has submitted no affidavit from Gonzalez.

In his Section 2255 motion, Cepeda contends that Gonzalez would have testified that Chapa was an informant and that this evidence would have supported a defense theory that Chapa was killed by other people as a result of being an informant. (Mot. at 5.) But there are multiple problems with this argument. First, Cepeda's mere assertions do not constitute evidence of what Gonzalez would have testified to. Second, the record does not support his assertion that Gonzalez would have testified that Chapa was an informant. Although the parties disputed whether investigation reports showed that Gonzalez might have information that Chapa kidnapped her family,[4] there was never any suggestion that Gonzalez had information that Chapa was an informant. (CR No. 428 at 7, 9, 15-16.) Third, even assuming for the sake of argument that Gonzalez could have and would have testified that Chapa was an informant, Cepeda fails to show that he was prejudiced by his counsel's failure to obtain such testimony. The testimony would have been cumulative of other evidence in the record. (*See* CR No. 366 at 119) (defense expert Fleming testifying that "the evidence [the government gave him] showed that he [Chapa] was working as an informant for you").) Moreover, it would have been completely consistent with the government's theory of the case. As Campano testified, the reason why the Beltran-Leyva cartel finally gave Gato permission to kill Chapa was

---

[4] Specifically, prior to trial, Cepeda's counsel sought a continuance so that he could find Gonzalez, who counsel believed would testify about Chapa's kidnapping and killing of her family. (CR No. 428 at 7, 9.) In response, the government argued that defense counsel misunderstood the investigation reports, which, at best, indicated that Gonzalez's family was kidnapped, that Gonzalez believed Chapa could help her, and that Chapa was either unwilling or unable to do so. (CR No. 428 at 15-16.) As the government emphasized, "[t]here is no report that would indicate that [Elena] Gonzalez ever saw Juan Guerrero Chapa kidnap any member of her family." (*Id.*) Ultimately, this Court denied the continuance, holding that "there is no basis for me to grant a continuance . . . to go on a rabbit trail to search for evidence [from Gonzalez] that may, in fact, not be evidence at all." (CR No. 428 at 15-16.)

because it made a deal with the Gulf Cartel allowing the killing. (CR No. 433 at 93.)

Thus, the proposed testimony that Chapa was an informant against the Gulf Cartel would

not have undermined the jury's finding that Gato commissioned Chapa's murder.

Cepeda fails to show both deficient performance and prejudice based on his counsel's

failure to call Gonzalez as a witness.

### iii.    Miriam Cepeda and Laura Lynette Having

Cepeda argues that his trial counsel provided ineffective assistance when he failed

to call Miriam Cepeda and Laura Cepeda (Laura Lynette Having) "as defense witnesses

to testify about relevant rebuttal facts to the government's case." (Mot. at 13.) But his

factual premise is wrong. His trial counsel did call Miriam and Laura Cepeda as

witnesses at trial. (CR No. 439 at 153-78.) To the extent Cepeda claims that his counsel

failed to investigate how Miriam Cepeda and Laura Having "could rebut the

government's case in chief" and to elicit that testimony at trial, (Mot. at 13), he fails to

specifically identify the content of such proposed testimony.

In Having's affidavit, she asserts that "Attorney Rogers missed a lot of critical

details and failed to provide the jury with information that they should have heard"—but

she does not specifically identify what details or information Rogers failed to present at

trial. (Mot. at 42.) The few details stated in her affidavit—that she accompanied Cepeda

on two trips to Mexico after Chapa's murder and that, on one of those trips, they saw

Campano at a family dinner at the Rey Del Cabrito restaurant, (Mot. at 41)—was already

testified to at trial, either by her or her sister Miriam. (CR No. 439 at 162-67, 172-73.)

And the only detail stated in her affidavit that was not elicited at trial was that Having

17

was purportedly "sitting next to [her] father [Cepeda] at the dinner for the whole time."
(Mot. at 41.)  But Cepeda cannot show that his counsel's failure to elicit this testimony
prejudiced him.  Indeed, if anything, it benefited him because the proposed testimony
would only have impeached Having.  Based on a photograph taken of the family dinner at
the Rey Del Cabrito restaurant, (DX 18), and Miriam's testimony identifying the people
in the photograph, (CR No. 439 at 163), it is very clear that, contrary to her affidavit,
Having did not sit next to Cepeda at the dinner "for the whole time."



(DX 18; CR No. 439 at 163 (Miriam testifying that Having is the one with glasses on the right and Cepeda is the one with the cap on the end).)[5]

In Miriam's affidavit, she asserts that "Mr. Rogers never asked [her] questions or elicited information that [she] believe[s] was crucial to [her] father's [Cepeda's] case." (Mot. at 45.)  She lists categories of subjects Rogers allegedly failed to ask her about at trial—i.e., Cepeda's trips to Mexico after Chapa's murder, her conclusions about Ledezma's character, her conclusions regarding Campano's truthfulness, her father's "gullible nature," and the "extent of cash flow" in Cepeda's business—but she does not specifically state what she would have testified to.  (Mot. at 45.)  As such, Cepeda fails to show that his counsel performed deficiently by purportedly failing to elicit this undefined testimony.  *Day*, 566 F.3d at 538.  Moreover, as discussed, the record demonstrates that Cepeda's trips to Mexico after Chapa's killing were testified to, either by Miriam or Having.  (CR No. 439 at 162-67, 172-73.)  And assuming that Miriam could and would have testified that Ledezma is a bad person and that Campano has a tendency to lie, Cepeda fails to show that his counsel performed deficiently by failing to elicit such testimony, as a reasonable attorney could have concluded that such testimony risked undermining Cepeda's defense that he assisted Ledezma and Campano because he believed they were simply locating a white-collar criminal for a bank.  After all, if Cepeda's daughter—who had significantly less interaction with Ledezma and Campano

---

[5] The evidence also indicated that neither Having nor her sister were with Cepeda at other points in their trip to Mexico.  (*See, e.g.*, CR No. 439 at 164, 166 (Miriam testifying that Cepeda stayed in a separate hotel room from her and Having and that, after dinner, she went out with a cousin that is her age).)

than Cepeda did[6]—knew Ledezma and Campano were bad news, why was Cepeda working with them?  Further, Cepeda fails to show that the proposed testimony about his supposedly gullible nature would have made a difference in light of the overwhelming evidence of his culpable mental state presented at trial, including (a) Cepeda's repeated use of false names during the conspiracy;[7] (b) his emails indicating that he knew Ledezma was not working for a bank and was not trying to locate a white-collar criminal;[8] (c) the fact that he wanted Ledezma to remove the decal identifier on the tracker that was placed on Chapa's Land Rover just hours before the murder;[9] (d) his intentional destruction of evidence after Chapa was murdered;[10] (e) the fact that, after the murder, Cepeda did not act like a person who had been duped by Ledezma, but rather, he continued to visit and seek business with Ledezma;[11] as well as (f) Campano's testimony that Cepeda knew the purpose of the conspiracy to murder Chapa.[12]

### iv.   Joey Cepeda

Cepeda argues that his trial counsel performed deficiently by failing to call his son, Joey, to testify.  In his affidavit, Joey states that he "could have provided relevant testimony supporting [his] father's innocence, lack of knowledge, and provided

---

[6] (CR No. 439 at 157, 167-68 (Miriam testifying that she did not see Ledezma a lot in her childhood and that she had a couple of meals with him).)

[7] (CR No. 435 at 111-12, 126-27; GXs 4, 87, 264, 416, 549.)

[8] (GXs 218, 240, 354; CR No. 435 at 36-38, 56-57.)

[9] (CR No. 366 at 49-50.)

[10] (CR No. 436 at 113-38; CR No. 437 at 50, 59-60; CR No. 439 at 176-77.)

[11] (CR No. 433 at 151, 153-54; CR No. 436 at 14-15; CR No. 365 at 54; CR No. 366 at 34; GX 394.)

[12] (CR No. 433 at 182-83; CR No. 434 at 53.)

information and specifics how Ledezma and Campano tricked and took advantage of [his] father and secreted the true purpose of the conspiracy from [his] father." (Mot. at 55-56.) But he has not alleged with specificity the content of any of that proposed testimony. He claims that he could have rebutted Campano's testimony about seeing him in Florida because he and Campano were not in Florida at the same time. (Mot. at 57.) But Campano never testified that he saw Joey in Florida. To the contrary, Campano testified that he had "never been with [Joey] at the time . . . [he, Cepeda, and Ledezma were] doing the investigation"—that Joey's role was "before [Campano] went to Florida," and that he learned about Joey's role from either Ledezma or Cepeda. (CR No. 433 at 105.) Therefore, with Joey's affidavit—which fails to allege with specificity the testimony Joey would have provided and makes assertions about Campano's testimony that are clearly refuted by the record—Cepeda fails to show both deficient performance and prejudice in his counsel's decision not to call Joey as a witness.[13]

## C. Cepeda fails to show that he was prejudiced by his counsel's purported failure to advise him of his right to testify and to call him to the stand (Ground Eight).

A criminal defendant has a constitutional right to testify in his own behalf, and this right is granted to the defendant personally and not to his counsel. *See Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). In an affidavit, Cepeda alleges that counsel failed to advise

---

[13] To the extent Cepeda claims that trial counsel should have allowed him to "make the decision whether or not his son [Joey] would testify," (Mot. at 36), Cepeda is wrong. The decision on what witnesses to call, like other strategic and tactical decisions, is "the exclusive province of the lawyer." *Alvord v. Wainwright*, 469 U.S. 956, 960 n.5 (1984); *see also Gonzalez v. United States*, 553 U.S. 242, 249 (2008) (providing tactical decisions generally controlled by counsel include "the objections to make, the witnesses to call, and the arguments to advance").

21

him of his right to testify.  (Mot. at 35.)  But even assuming Cepeda's counsel did not so advise him, Cepeda fails to show any prejudice because the record clearly demonstrates that Cepeda was aware of his right to testify.  Specifically, on the third day of trial, before the jury was brought in and while Cepeda was present in the courtroom, the AUSA stated that "both defendants [Ledezma and Cepeda] have a constitutional right to testify."  (CR No. 434 at 7.)  Further, before Cepeda put on evidence in his defense, his codefendant Ledezma took the stand to testify in Ledezma's defense—thereby making clear to Cepeda that a defendant has the right to testify in his own defense.  (CR No. 437 at 106.)  In view of this record, Cepeda was clearly aware that he had the right to testify, and he therefore fails to show any prejudice from his counsel's purported failure to advise him of that right.

Cepeda claims that he "wanted to testify" and that he "disclosed this to Rogers"—implying, without quite alleging, that his counsel prevented him from testifying.  (Mot. at 36.)  But even assuming for the sake of argument that Cepeda's counsel somehow prevented him from testifying, Cepeda's claim fails because he had made no effort to show prejudice.  In both his motion and affidavit, Cepeda fails to allege with specificity the facts to which he would have testified.  Rather, in conclusory fashion, he states that he "had knowledge of information and facts that would have rebutted accusations against him and have rebutted testimony of government witnesses."  (Mot. at 36.)  Such bald assertions fall far short of establishing ineffective assistance of counsel.  *See Palmer v. Hendricks*, 592 F.3d 386, 395, 400 (3d Cir. 2010) (holding that the district court did not err in denying the petitioner's claim without an evidentiary hearing where his affidavit

did not state the facts to which he would have testified); *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001) ("Sayre's self-serving conclusory statement that his testimony would have resulted in an acquittal, standing alone [without any explanation as to what his testimony would have been], falls far short of satisfying *Strickland*'s prejudice element."); *Delgado v. United States*, No. 09-CV-50, 2010 WL 582551, at *4 (S.D. Tex. Feb. 10, 2010) (holding that Delgado cannot prevail in his claim that he was denied his right to testify where he "does not state which facts he would have testified to").

### D.    Cepeda's claim that counsel failed to adequately cross-examine Campano is conclusory (Ground Four).

Cepeda claims that his trial counsel "failed to adequately cross-examine" Campano because "[t]here existed at least four witnesses available to rebut coconspirator Campano's testimony." (Mot. at 8.) Cepeda fails to identify both the substance of Campano's testimony that would have been elicited had he been adequately cross-examined, as well as the witnesses he claims would have rebutted Campano's testimony. As such, the claim fails as conclusory. *See Day*, 566 F.3d at 539-40 (holding that petitioner's "mere allegation of inadequate performance during cross-examination" was conclusory where she did "not offer a concrete explanation of the testimony that alleged proper cross-examination would have elicited"); *United States v. Irby*, 103 F.3d 126, 1996 WL 731500, at *4 (5th Cir. Nov. 26, 1996) (rejecting petitioner's claim of inadequate cross-examination where he "fail[ed] to set forth the substance of the witness's testimony and the possible impact of any additional cross-examination").

Moreover, to the extent this claim is based on the same conclusory assertions underlying Cepeda's claims that counsel failed to properly investigate and call other witnesses, it fails for the same reasons.  (*See* Parts 1(A) & (B), *supra*.)

### E.   Cepeda fails to show a conflict of interest with his trial counsel (Ground Three).

Cepeda claims that he received ineffective assistance because "there existed a conflict of interest between [him and his trial counsel] in how to defend against the government's three-count indictment."  (Mot. at 7.)  But a personality conflict or a defendant's mere disagreement with his attorney's strategy does not give rise to a conflict of interest.  *See Whitfield v. Davis*, No. 4:15-CV-1876, 2016 WL 3166852, at *5–6 (S.D. Tex. June 7, 2016) (holding that while movant's "complaints identify possible personality conflicts with counsel and possible conflicts over trial strategy," "[h]e does not . . . identify any conflict of interest").  And Cepeda fails to allege any facts supporting an actual conflict of interest—as he fails to show any duty owed by counsel or any personal interest of counsel that was adverse to Cepeda's interests.  *See Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979) (holding that "[a] conflict of interest must be actual rather than speculative before the constitutional guarantees of effective assistance of counsel are implicated," and that an actual conflict exits when an "attorney owes duties to a party whose interests are adverse to those of the defendant").

As for the personality conflicts and disagreements Cepeda mistakenly categorizes as "conflicts of interest," he fails to show that any of his counsel's alleged actions—such as "rarely personally visit[ing]" him while he was incarcerated, becoming "agitated and

24

angry" during visits, "not listen[ing] to any statements that identified mistakes" in the government's discovery, becoming "highly defensive when he was questioned about what he was working on," threatening Cepeda, and purportedly saying that he was "good friends" with the AUSA and that the "FBI does not lie" —prejudiced him.  (Mot. at 7.) Cepeda fails to identify both (i) the information his counsel would have elicited if he had visited Cepeda more and acted differently during his visits and (ii) the impact such information would have had on the trial.  As such, his claim fails on *Strickland*'s prejudice prong.  *See Miller*, 200 F.3d at 282 (holding that simply making conclusory allegations of prejudice is insufficient to meet the *Strickland* test); *Green*, 882 F.2d at 1002-03 (rejecting petitioner's ineffective-assistance claim where he was "unable to show what further investigation would have revealed and how it would have helped him").

Moreover, the record demonstrates that attorney Rogers provided a vigorous defense by hiring an investigator,[14] enlisting co-counsel,[15] making repeated motions to sever and zealously protecting Cepeda from the Rule 404(b) evidence admitted against Ledezma,[16] moving to qualify an expert,[17] tirelessly seeking the admission of evidence he

---

[14] (CR No. 428 at 7.)

[15] (CR Nos. 25-28.)

[16] (*See, e.g.,* CR No. 202; CR No. 433 at 73, 88, 165-66; CR No. 436 at 21-22; CR No. 437 at 105; CR No. 365 at 82.)

[17] (CR No. 268; CR No. 428 at 23.)  Moreover, counsel's efforts to admit Dr. Yonovitz's testimony in order to impeach the credibility of the FBI agents demonstrates that, contrary to Cepeda's late-made assertions, counsel did not shy away from challenging the truthfulness of FBI agents when the argument could be made.  (CR No. 428 at 76 (arguing that Dr. Yonovitz's testimony that there was no battery outage would impeach any agent that testifies to that).)

believed favorable to Cepeda,[18] calling eight witnesses to testify in Cepeda's defense at

trial,[19] moving for judgment of acquittal,[20] and filing a motion for a new trial.[21]

>   **F.    Cepeda fails to show prejudice in his counsel's purported failure to
>   properly prepare Dr. Al Yonovitz to be qualified as an expert witness
>   (Ground Nine).**

Cepeda argues that trial counsel "did not adequately prepare the defense expert to

be qualified to testify for the defense," and, for support, he "refers the Court to the trial

testimony at which trial counsel called the expert as a defense witness, but was not

allowed to testify by the trial court."  (Mot. at 21.)  As an initial matter, the government

assumes "the defense expert" to which Cepeda refers is Dr. Al Yonovitz, whose proposed

testimony was that, contrary to the FBI's explanation, battery failure was not the reason

the video camera stopped recording during Cepeda's post-arrest interview.  (CR No. 335

at 3.)  But his claim—which is based entirely on the hearing transcript in which the

district court excluded Dr. Yonovitz's testimony—appears to rely on the benefit of

hindsight.  Indeed, despite a lengthy and vigorously argued *Daubert* hearing,[22] Cepeda

posits that his trial counsel[23] was constitutionally deficient simply because of the

hearing's result—the Court's exclusion of the proposed testimony.  But "a fair

---

[18] (*See e.g.,* CR No. 316; CR No. 429 at 9, 18; CR No. 438 at 3-4; CR No. 439 at 221) (Rogers repeatedly arguing for admission of a note Ledezma sent to Campano while the men were in custody).

[19] (CR No. 439 at 140-224.)

[20] (CR No. 437 at 104.)

[21] (CR No. 354.)

[22] (CR No. 428 at 23-81.)

[23] Notably, attorney Cooper, not Rogers, handled the *Daubert* hearing, so in making this argument, as with many of his other arguments, Cepeda is criticizing not just one attorney but his entire trial team.

assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," *Strickland*, 466 U.S. at 669, and the fact that counsel was unsuccessful in his effort to admit Dr. Yonovitz's expert testimony does not mean that he was legally deficient.  *See Gray v. Lucas*, 677 F.2d 1086, 1094 (5th Cir. 1982) ("[T]he fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance.").

In his affidavit, Cepeda argues that counsel performed deficiently because he did not procure "the original audio video machine FBI agents utilized to record [Cepeda] upon detention and arrest;" rather, counsel "allowed [the] expert to conduct tests on a duplicate model rather than the original," and "[t]his mistake" resulted in the Court excluding the expert's testimony.  (Mot. at 37.)  But even assuming that allowing Dr. Yonovitz to conduct his tests on a duplicate model, rather than procuring the original video camera, falls outside that "wide range of reasonable professional assistance," Cepeda fails to show prejudice.  *See Strickland*, 466 U.S. at 669 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").

First, he fails to show a reasonable probability that Yonovitz's testimony would have been admitted if counsel had obtained the original video recorder.  The Court excluded Yonovitz's testimony on multiple grounds—including Yonovitz's admission that "he had not reviewed any research regarding how to conduct tests regarding whether a video camera had stopped due to battery failure, that he had never testified before regarding battery failure, … that no scientific standards specifically control the testing of

27

battery failure," and that "he never tried plugging in the camcorder when the battery died and resuming recording with the camcorder plugged in, which is what the government contends actually happened." (CR No. 335 at 2-3.) Any of these other grounds would have supported the Court's decision to exclude Yonovitz's testimony even if the original recording device had been obtained. *See* Fed. R. Evid. 702 (providing that a witness who is qualified as an expert may testify . . . if, inter alia, the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert has reliably applied the principles and methods to the facts of the case).[24]

Cepeda also fails to show a reasonable probability that the Court would have admitted the testimony given that it was offered in response to evidence the government ultimately decided not to put on. Specifically, defense counsel offered Yonovitz's testimony in response to anticipated agent testimony that Cepeda admitted his involvement in the crime during his post-arrest interview after the camera battery died and the camera stopped recording. (CR No. 428 at 75-77.) But prior to trial, the government announced that it would not be introducing Cepeda's post-arrest statements in its case in chief. (CR No. 429 at 3-4.) As such, Yonovitz's testimony—offered to counter evidence the government was no longer introducing—would not have "help[ed]

---

[24] Similarly, Cepeda fails to show that, had his counsel obtained the original device and had Yonovitz perfectly replicated the conditions of the camera's recording stoppage during his post-arrest interview, Yonovitz would have still been willing to testify that battery failure was not the reason the camera stopped recording. Indeed, at the *Daubert* hearing, the government stated that the FBI lab's experiments using the original device and replicating the conditions of the stoppage during Cepeda's interview supported the agents' explanation that it was battery failure. (CR No. 428 at 80.)

the trier of fact to understand the evidence or determine a fact issue," and Cepeda thus fails to show a reasonable probability that, but for his counsel's purported deficiencies, the Court would have admitted Yonovitz's testimony.  *See* Fed. R. Evid. 702(a); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (noting that trial judges are assigned the task of ensuring that an expert's testimony "both rests on a reliable foundation and *is relevant to the task at hand*") (emphasis added).[25]

### G.  Cepeda's assertion regarding counsel's stipulation with the government is wholly unsupported by the record, and, in any event, Cepeda fails to show prejudice (Ground Six).

Cepeda argues that his counsel acted ineffectively when he told Cepeda's family that "the defense needed no other defense witnesses" because he had "stipulated with the government that [Cepeda] played a minor role in the alleged conspiracy."  (Mot. at 15.) He claims "a review of the trial testimony shows" this.  (Mot. at 15.)  But the record actually refutes his contention.  Indeed, the only stipulation made by the parties at trial to cut down on the number of defense witnesses was as follows:  "The parties—well, Defendant Cepeda and . . . the United States agree that should these witnesses [Robert Mclean] be called . . . that there would be no evidence that Defendant Ledezma told people that were not in the conspiracy that he was here to kill someone."  (CR No. 439 at 190.)  Therefore, contrary to Cepeda's assertion, his counsel did not stipulate that Cepeda played a minor role in the alleged conspiracy.

---

[25] For similar reasons, Cepeda fails to show a reasonable probability that the outcome of the trial would have been different had the proposed testimony been admitted.  Because the government did not rely on Cepeda's post-arrest statements to prove his guilt, the discounting of those statements with Yonovitz's testimony would not have changed the outcome of the trial.

Additionally, to the extent Cepeda contends that he was prejudiced by his counsel's stipulation because "other defense witnesses that could [have] rebut[ted] the [government's] case in chief" were not called, his allegations fail as conclusory. (Mot. at 15.) He fails to identify what defense witnesses would have been called but for his counsel's stipulation, let alone the substance of their testimony and how it would have impacted the trial. And to the extent those other witnesses are those he names in his Ground-One and Ground-Five claims, as discussed above, he fails to show how that testimony would have altered the outcome of the trial. (*See* Part 1(B), *supra*.)

## 2.   Cepeda fails to show that his appellate counsel provided ineffective assistance (Ground Seven).

Cepeda argues that his appellate counsel, William Reagan Wynn, provided ineffective assistance, because he "should have raised issues related to the trial court's overruling objections to inadmissible 404b evidence of extraneous offenses and sufficiency of the evidence." (Mot. at 17.) But he fails to show deficient performance or prejudice.

As the Supreme Court has held, appellate counsel who files a merits brief "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Although "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim," "it is difficult to demonstrate that counsel was incompetent." *Id.* "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome." *Id.*

(citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  Cepeda fails to make that showing here.

He claims that appellate counsel should have challenged the "inadmissible 404b evidence of extraneous offenses."  (Mot. At 17.)  But he fails to show how such a claim was "clearly stronger" than the severance argument counsel did raise.  Indeed, because that evidence was admitted only against Ledezma, not Cepeda, the only real argument Cepeda had against it was the one he made—that its admission against Ledezma spilled over and unfairly prejudiced him, requiring severance.  *See Ledezma-Cepeda*, 894 F.3d at 690-91.

Additionally, his claim that appellate counsel should have brought a sufficiency-of-the-evidence claim is conclusory—as he cites no trial evidence or law indicating the merits of such a claim, nor does he even allege against which of the three counts of his conviction a sufficiency challenge should have been raised.  As such, he cannot show that such a challenge was "clearly stronger" than the severance argument presented, and he fails to show his counsel performed deficiently.  *Smith*, 528 U.S. at 288.  His conclusory assertions also fall far short of showing a reasonable probability that, but for his counsel's purported failures, the outcome of his appeal would have been different.  Indeed, considering the high deference accorded to a jury's verdict on appellate review[26] and the

---

[26] The Fifth Circuit's review of the sufficiency of the evidence is "highly deferential to the verdict." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  The Fifth Circuit "accept[s] all credibility choices and

overwhelming evidence of Cepeda's guilt presented at trial,[27] there is no reasonable

probability of a different result apparent in the record.  Accordingly, this claim also fails

on *Strickland*'s prejudice prong.

3.     **Cepeda mere speculation that there "may" have been prosecutorial misconduct falls far short of showing entitlement to Section 2255 relief (Ground 10).**

Cepeda claims that "[t]here may exist prosecution misconduct by the government"

because Cepeda "has newly discovered evidence from a witness that co-defendant

[Campano] admitted he lied to the jury about [Cepeda's] involvement in each count of

the indictment to save himself and his father," and that Campano did so "either with

knowledge of the government or by instruction by the government agents."  (Mot. at 23.)

But his claims are both speculative and conclusory.[28]

To obtain Section 2255 relief on the ground that the government relied on perjured

testimony, the movant must show: (1) the contested statements were actually false; (2)

the statements were material; and (3) the prosecution knew that they were false.  *See*

*Tucker v. Johnson*, 242 F.3d 617, 626 (5th Cir. 2001).  To prove that the contested

---

reasonable inferences made by the trier of fact which tend to support the verdict."  *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997).

[27] This evidence included Campano's testimony that Cepeda knew the purpose of the conspiracy to murder Chapa, Cepeda's repeated use of false names during the conspiracy, his emails indicating that he knew Ledezma was not working for a bank or a legitimate client, the fact that he wanted Ledezma to remove the decal identifier on Tracker 118 before it was placed on Chapa's vehicle hours before the murder, his intentional destruction of evidence after Chapa was murdered, and the fact that after the murder Cepeda did not act like someone who had been duped by Ledezma, but rather, continued to seek business with Ledezma.  (*See, e.g.*, Gov't Br., No. 16-11731, 2018 WL 1002774, at *25-27 (filed Feb. 12, 2018) (discussing the evidence and citing the record on appeal).)

[28] For these reasons, Cepeda's claim can be most expediently disposed of on the merits.  But the government notes that the claim is also procedurally barred, as Cepeda makes no effort to show prejudice or cause for failing to raise the claim in his direct appeal.

statements were "actually false," it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements.  Perjury is not established by mere contradictory testimony from witnesses or inconsistencies with a witness's testimony.  *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990).  Additionally, perjured testimony is "material" only when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000).

Here, Cepeda identifies no particular statements in Campano's trial testimony that he claims were actually false, he offers no evidence proving that such uncited statements were actually false, he makes no argument showing that such uncited statements were material, and he offers no evidence showing that the prosecution knew they were false.  Rather, in conclusory fashion, he claims he has "newly discovered evidence" from some unidentified "witness" that Campano "admitted he lied to the jury."  The undersigned has conferred with the trial AUSA and the investigating agent in this case, and neither is aware of any information indicating that Campano has recanted his testimony or admitted that he lied to the jury.  Moreover, Cepeda's conclusory assertion that Campano lied to the jury to save his father is improbable on its face, as Campano testified against his father at trial.  (*See, e.g.*, CR No. 433 at 79 (Campano testifying that it was difficult to testify against his father, Ledezma).)

In short, because Cepeda offers nothing to support his speculative claim that "there may exist prosecution misconduct" premised on the conclusory allegation that "Campano lied before the jury either with knowledge of the government or by instruction

33

by the government agents," his claim fails.  *See Roberson v. United States*, No. 3:14-CV-485, 2015 WL 1525007, at *5 (N. D. Tex. Apr. 2, 2015) (rejecting movant's conclusory claim that the prosecution presented false testimony); *United States v. Sierra*, No. 05-CV-101, 2010 WL 323564, at *2 (E.D. La. Jan. 20, 2010) (same); *Whittington v. United States*, No. DR-08-CA-79, 2009 WL 10718750, at *37 (W.D. Tex. July 29, 2009) (same).

### 4.    Cepeda's actual-innocence claim does not provide an independent ground for relief (Ground 11).

Cepeda claims that he is "actually innocent."  (Mot. at 25.)  But, as the Supreme Court has held, such a claim does not entitle him to habeas relief.  This is because "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  Therefore, when a movant "does not seek excusal of a procedural [or a statute-of-limitations bar] so that he may bring an independent constitutional claim challenging his conviction or sentence, but rather argues that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect"—as Cepeda argues here—he is "not entitled to habeas relief."  *Id.*  "The fundamental miscarriage of justice exception is available only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence;" it does not extend to freestanding claims of actual innocence.  *Id.* at 404-05.  As such, Cepeda's freestanding claim of actual innocence does not entitle him to Section 2255 relief.

34

Moreover, even assuming Cepeda raises the claim merely as the gateway to bring an independent constitutional claim (which he clearly does not), he fails to prove even the gateway.  As the Supreme Court has stressed, that gateway is narrow—applying only to "a severely confined category: cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted the petitioner.  *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013).  Here, Cepeda claims that his actual innocence is "supported by FBI 302's provided to defense post-trial," which "indicate another cartel/ or individuals not associated with defendant carried out the murder in this case."  (Mot. at 25.)  The undersigned has consulted with the trial AUSA and the investigating agent, and it is unclear to the government what Cepeda is talking about.  As far as the government can tell, none of the FBI 302 reports created and provided to Cepeda after his trial suggest that "another cartel or individuals not associated with defendant" carried out Chapa's murder.  The only reports that appear to even remotely approach Cepeda's allegations of actual innocence are two in which the same interviewee stated that he/she heard Gato say that the "third person arrested" with Ledezma and Campano "had nothing to do with the plan to kill [Chapa]" and that Gato was mad that Ledezma and Campano had involved the third person.  But even if Cepeda is referring to those reports, he fails to shows that, based on them, it is "more likely than not that *no* reasonable juror would have convicted" him.

First, the agent advised that the interviewee in question has since recanted the information.  Second, and more importantly, these overheard hearsay statements of Gato—even assuming they could have been admitted at trial—would not have

35

undermined the overwhelming evidence of Cepeda's guilt, as Gato was simply not privy to the extent of information Ledezma and Campano shared with Cepeda.  Indeed, Cepeda's actions—using false names,[29] sending emails indicating that he knew Ledezma was not working for a legitimate client,[30] wanting the decal removed from the tracker placed on Chapa's vehicle hours before the murder,[31] destroying evidence after the murder,[32] continuing to seek business with Ledezma after the murder,[33] and searching for Chapa's brother, another of Gato's targets, on his phone after the murder[34]—speak much louder than Gato's purported words in showing that Cepeda knowingly and willingly joined the conspiracy to murder Chapa.  Because he fails to show that these reports demonstrate that it is more likely than not that no reasonable juror would have convicted him, he fails to open the actual-innocence gateway (to raise an independent constitutional claim he does not have).

## CONCLUSION

The Court deny Cepeda's motion.

---

[29] (CR No. 435 at 111-12, 126-27; GXs 4, 87, 264, 416, 549.)

[30] (CR No. 435 at 36-38, 56-57; GXs 218, 240, 354.)

[31] (CR No. 366 at 49-50.)

[32] (CR No. 436 at 113-38; CR No. 437 at 50, 59-60; CR No. 439 at 176-77.)

[33] (CR No. 433 at 151, 153-54; CR No. 436 at 14-15; CR No. 365 at 54; CR No. 366 at 34; GX 394.)

[34] (CR No. 433 at 168; CR No. 366 at 35; GX 533 at 8.)

Respectfully submitted,

Erin Nealy Cox
United States Attorney

*/s/ Gail Hayworth*
Gail Hayworth
Assistant United States Attorney
Texas Bar No. 24074382
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone:  (214) 659-8600
gail.hayworth@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on March 24, 2020, I filed this response with the clerk of court for the

U.S. District Court, Northern District of Texas using the electronic filing system which

will generate service to Mark Alan Hoak, counsel for Cepeda-Cortes .

*/s/ Gail Hayworth*
Gail Hayworth
Assistant United States Attorney

37