IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOSE LUIS CEPEDA-CORTES, JR.    )(
            Movant    )(
                     )(     No. 4:19-CV-934-Y
v.                      )(     (4:14-CR-151-Y)
                     )(
UNITED STATES OF AMERICA    )(
            Respondent    )(

<u>MOVANT'S REPLY TO RESPONDENT, GOVERNMENTS ANSWER TO MOVANT'S
MOTION UNDER 28 U.S.C.§2255</u>

Respectfully submitted,

Mark Hoak
Attorney at Law

<u>/s/Mark Alan Hoak</u>
Mark Alan Hoak
Texas Bar Card: 09736520
Law Office of Mark A. Hoak
1307 B West Abram Street# 100
Arlington Texas 76013
Telephone Number 817-740-8900
Facsimile Number 214-723-5964
Email: markhoak@gmail.com
Attorney for Defendant
JOSE CEPEDA-CORTES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………………iii-iv

REPLY TO GOVERNMENT'S RESPONSE TO
MOTION UNDER 28 U.S.C. § 2255……………………………………………………… 1

STATEMENT OF THE CASE…………………………………………………………………..1

STATEMENT OF THE ISSUES……………………………………………………………….. 1-3

STATEMENT OF THE FACTS………………………………………………………………... 3-5

ARGUMENT AND AUTHORITIES

    Movant's Reply to Government's Response to Ground No. 1…………………………  7-15

    Movant's Reply to Government's Response to Ground No. 2…………………………  7-15

    Movant's Reply to Government's Response to Ground No. 3…………………………... 15-16

    Movant's Reply to Government's Response to Ground No. 4…………………………… 16

    Movant's Reply to Government's Response to Ground No. 5…………………………… 16-17

    Movant's Reply to Government's Response to Ground 6…………………….......17-18

    Movant's Reply to Government's Response to Ground No. 7…………………………… 18

    Movant's Reply to Government's Response to Ground No. 8…………………………… 19

    Movant's Reply to Government's Response to Ground No. 9…………………………… 19-20

    Movant's Reply to Government's Response to Ground No. 10………………………….. 20

    Movant's Reply to Government's Response to Ground No. 11…………………………… 20

CONCLUSION……………………………………………………………………………..21

CERTIFICATE OF SERVICE………………………………………………………………..21

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES:**

*Baylor v. Estelle*, 94 F3d 1321 (9th Cir. 1996)…………………………………………...15

*Capua*, 656 F.2d at 1037. …………………………………………………………………… 5

*Chambers v. Armoutrout*, 907 F2d 825 (8th Cir. 1990)………………………………….. 7

*Couch v. Butler,*632 F2d 24, (6th Cir., 2011)………………………………………………… 15

*Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004)…………………… 7

*Harris v. Reed* 894 F2d 871 (7th Cir. 1990)…………………………………………...7

*Harris By and Through Ramseyer v. Wood*, F.3d 1432 (9th Cir. 1995)…………………………… 21

*Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)…………………… 7

*Mapes v. Croyle*, 171 Fed 408 (6th Cir. 1999) …………………………………………… 18

*Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992)………………………………………………...21

*Matire v. Wainwright*, 811 F. 2d 1430 (11th Cir.1987)…………………………………………...18

*Parker v. Arkansas* 483 U.S. 44 (1987)…………………………………………………… 19

*Rutland v. State*, 415 S.C. 570 (2016)…………………………………………………………17

*Simms v. Livesay*, 970 F2d 1575 (6th Cir.1992)…………………………………………… 15

*Soffar v. Dretke*, 427 F3d 286 (5th Cir. 2005)…………………………………………… 15

*Strickland v. Washington,*466 U.S. 668, 687 (1984)……………………………………………… 6,14

*United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) (citation omitted)…………………… 5

*Wainwright v. Sykes*, 433 U.S. 72, 93 n.1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger C.J., concurring)…………………………………………………………………………………7

**FEDERAL STATUTES AND RULES:**

28 U.S.C.§ 2255……………………………………………………………………………... 5,6

MOVANT'S REPLY TO RESPONDENT, GOVERNMENT ANSWER/RESPONSE TO MOVANT'S MOTION UNDER 28 U.S.C. §2255

The Court should grant Cepeda's motion to vacate, set aside, or correct his convictions under 28 U.S.C.§ 2255 because the various claims he raises have merit in whole or part.

## STATEMENT OF THE CASE

After a two-week trial, a jury found Cepeda guilty of interstate stalking and aiding and abetting, conspiracy to commit murder for hire, and tampering with documents or proceedings. Cepeda appealed, and the Fifth Circuit affirmed his convictions.  *United States v. Ledezma-Cepeda*, 894 F.3d 686 (5th Cir. 2018).  After the Supreme Court denied Cepeda's petition for writ of certiorari, *Cepeda-Cortes v. United States,* 139 S. Ct. 467 (2018), he timely filed his first Section 2255 motion.

## STATEMENT OF THE ISSUES

GROUND 1: Defendant Cepeda-Cortes received ineffective assistance of trial counsel when he failed to call defendant's son, Joey Cepeda, Bob McLean, Elena Gonzalez, as witnesses for the defense.

GROUND 2: Defendant Cepeda-Cortes received ineffective assistance of counsel because trial counsel failed to properly, competently and diligently investigate all of the facts related to the government's allegation in each indicted count.

GROUND 3: Defendant Cepeda-Cortes received ineffective assistance of trial counsel because there existed a conflict of interest between them in how to defend against the government's three count indictment.

**1**

GROUND 4: Defendant Cepeda-Cortes received ineffective assistance of counsel when his trial attorney failed to adequately cross examine the co-operating codefendant witness, Ledezma Campano.

GROUND 5: Defendant Cepeda-Cortes received ineffective assistance of counsel when he failed to call, Gilbert Garza, Miriam Cepeda, Laura Cepeda, Hugo Resendez, Elena Gonzalez Joey Cortes, and the defendant as defense witnesses to testify about relevant rebuttal facts to the government's case.

GROUND 6: Defendant Cepeda-Cortes received ineffective assistance of counsel when trial counsel told the family of the Defendant that he stipulated with the government that he was minimally involved in the conspiracy and no other witnesses were necessary to testify.

GROUND 7: Defendant was denied effective assistance of counsel on appeal.

GROUND 8: Defendant Cepeda-Cortes received ineffective assistance of counsel when trial counsel failed to call the Defendant as a witness.

GROUND 9: Defendant received ineffective assistance of counsel, because trial counsel did not adequately prepare the defense expert to be qualified to testify for the defense.

GROUND 10: There may exist prosecution misconduct by the government.  Defendant-movant's investigation before filing this motion has revealed that the government witness Ledezma Campano lied before the jury either with knowledge of the government or by instruction by the government agents.

Movant has newly discovered evidence from witnesses

first and second sealed Affidavits that co-defendant, Ledezma-Campano, admitted he lied to

the jury about movant-defendant's involvement in each count of the indictment to save himself and his father.

GROUND 11: Defendant is actually innocent.  Evidence of actual innocence supported by F.B.I. 302's provided to defense post-trial and the two sealed affidavits indicate another cartel/or individuals not associated with defendant carried out the murder in this case.

## STATEMENT OF FACTS

The government's summary of evidence adduced at trial is reasonably accurate except for the conclusionary statements about Cepeda's involvement in knowing or having knowledge of the scheme to locate Chapa and have him killed. The following is a summary of the evidence supporting Cepeda's defense:

Cepeda did not contest the Government's evidence indicating he assisted Ledezma. Cepeda's defense was he believed his cousin, Ledezma, in his capacity as a private investigator, was conducting a lawful search for Chapa, because Chapa was a white-collar criminal who had stolen money from a business in Mexico.  As such, Cepeda argued he did not know the real reason for the search for Chapa until after he had been killed.

Ledezma needed Cepeda to assist him, because Cepeda was the only person he knew who spoke English well enough to help. Sometime in approximately the summer of 2012, Ledezma traveled to the McAllen, Texas area for the purpose of investigating possible addresses for Chapa. While in the McAllen area, Ledezma first approached Cepeda about assisting him. Ledezma freely admitted exploiting Cepeda's naivety and interest in being a private investigator to secure his assistance in looking for Chapa: "I play a lot with [Cepeda]. He always liked the

subject of private investigation, and the way I mentioned the matter to him that I was looking for a person, properties, well, I think he got interested."

Ledezma essentially tricked Cepeda into assisting him by playing on Cepeda's interest in becoming a successful private investigator - the thing Ledezma portrayed himself to be.  It was just like a game, a conversation. And I wasn't going to be involving more people in this case.  I never was." Ledezma described his cousin Cepeda as follows: "the way he is, he's very enthusiastic, and he wanted to learn about investigations.  Ledezma told Cepeda they were following someone who was very rich and important, but "unfaithful" to his wife

 Ledezma explained his trip to Dallas to Cepeda by saying, "I was looking for a person that fled from Mexico, who owed money, and a lot of people from Monterrey from businesses in Monterrey that have money, they have fled the danger in Mexico to come to the Dallas/Fort Worth area." Put another way, Ledezma confirmed he had told Cepeda his investigation was "on behalf of a bank who was looking for an attorney and an individual who had stolen a large sum of money."  Ledezma specifically testified he never told Cepeda he was working for Gato and instead told Cepeda he was working for "banks and attorneys."

In late November or early December Ledezma went to Florida, Ledezma determined he needed Cepeda's assistance because he was unable to effectively conduct his investigation due to his inability to speak English.

After the search moved to the Grapevine/Southlake area, on April 2, Ledezma explained to Cepeda, now that they found Chapa, "it was up to the attorneys, that it was up to the judicial system . . .the legal system and the attorneys, that was in their hands to take care of." Ledezma also told Cepeda he still needed to find out where Chapa was hiding the money because that

<u>4</u>

would be part of Ledezma's bonus or bounty for helping the bank locate Chapa and return him to Mexico.

It was not until some number of days after the murder that Ledezma told Cepeda Chapa had been killed. Ledezma specifically testified he never told Cepeda the real reason he was searching for Chapa, namely that he was being forced to do so by Gato and was afraid for his life if he did not do as he was instructed.

More than a year after Chapa's murder, agents arrested Ledezma and Campano as they entered the United States.  Cepeda was arrested shortly thereafter. At trial, Ledezma raised a duress defense. He admitted to every fact the government had proven but claimed he had to follow Gato's instructions to avoid death or serious harm to himself and his family. Cepeda's defense was that he contended that he lacked the mental state for stalking and murder for hire. He claimed he had been duped by Ledezma - that, during the investigation, Cepeda believed Chapa was a white-collar criminal who had stolen money from Mexican banks and that the investigation was legitimate.

## ARGUMENTS AND AUTHORITIES

### Standard of Review

Under 28 U.S.C.§ 2255, a prisoner may move the convicting court to vacate, set aside, or correct his conviction or sentence.  *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) (citation omitted)

Section 2255 is "reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and, would, if condoned, result in a complete miscarriage of justice." *Capua*, 656 F.2d at 1037. In other words, the scope

**5**

of relief under §2255 is consistent with that of the writ of habeas corpus." *Placente*, 81 F.3d at 558.

Ineffective-assistance-of-counsel claims are governed by the familiar *Strickland* test that requires the defendant to prove both deficient performance and prejudice.  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).

Movant submits that he has made a meritorious case for each of his claims in the 2255 motion that meets the standard necessary for the trial court to set his 2255 motion for an evidentiary hearing.  Movant filed seven supporting affidavits and two affidavits were filed under seal, supporting his 2255 claims, which are placed in an appendix and incorporated by reference as if set out verbatim.  Movant's 2255 motion form restricts him from providing expanded factual statements to support each allegation.  Movant should not be penalized by the government's response for movant complying with the 2255 forms space allotments in submitting his constitutional claims of ineffective assistance of counsel.

The government's response that the 2255 motion lacks more specific factual basis supports movant's request for an evidentiary hearing to allow movant to fully develop evidence in support of his claims. The government's opposition to movant's motion for discovery seeks to prevent Movant from fully investigating and obtaining evidence that is exclusively in the possession of the government. This barrier presented by the government undermines movant's right to fully develop and present factual evidence in support of his claims beyond the limited space provided in the 2255 motion form.

What is being secreted from movant's eyes? If there exists no evidence to support movant's claims then the government should not be afraid of the transparency of discovery.

<u>6</u>

Based on FBI 302's and the two sealed affidavits which provide gateway evidence that Chapa was not murdered pursuant to the government's trial evidence of the Beltran-Leyva cartel, but by the "Zetas" a different cartel, with no evidence of a connection to movant. It is only fair and just consistent with the meaning and concept of due process to allow movant the transparency and opportunity to view and produce all evidence that exists to support his last legal remedy to challenge his conviction.

Movant's Reply to Government's Response to Ground No. 1 and Ground No. 2

Failure to call or impeach a witness may be grounds for ineffective assistance.  With respect to the decision whether or not to use the defendant's testimony, in a 2004 decision, the Supreme Court reiterated that:

" "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate.  A defendant, this Court has affirmed, has 'the ultimate authority' to determine 'whether to . . . testify in his or her own behalf..'. . . . Concerning those decisions, the attorney must both consult with the defendant and obtain consent to the recommended course of action." *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004), quoting *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)) and *Wainwright v. Sykes*, 433 U.S. 72, 93 n.1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger C.J., concurring). *See also Harris v. Reed* 894 F2d 871 (7th Cir. 1990)."

Additionally, in *Chambers v. Armoutrout*, 907 F2d 825 (8th Cir. 1990) the Court wrote:

"In light of counsel's failure to adequately investigate the witness, counsel's decision not to call him at trial was therefore unreasonable. . . Furthermore, because the deference generally granted to strategic choices of trial counsel is not required due to the counsel's lack of preparation, the decision not to call witnesses at trial was itself unreasonable in light of all the circumstances as they appeared at the time..."

The defendant was prejudiced by counsel's deficient performance.

A review of the affidavits of the Defendant's son, Joey Cepeda II's shows that he provided the following claims and facts:

Some relevant excerpts from Jose Luis Cepeda II's affidavit are as follows:

1. Rogers failed to diligently interview, consult, and advise my father, Cepeda-Cortes. Mr. Rogers rarely met with my father in the preparation of his case. During the 13-day trial Mr. Rogers did not meet with my father.

2. Rogers failed to competently and diligently interview fact witnesses, who had personal knowledge of material facts evidencing the innocence of Cepeda-Cortes, and relevant to rebutting government accusations.  As a result, Mr. Rogers did not grasp or fully understand/comprehend material facts evidencing my father's innocence or have knowledge of material facts crucial to cross examine government witnesses, especially the cooperating co-conspirator, Jesus Campano, or rebut government accusations. Mr. Rogers always seemed nervous, impatient, and became highly defensive when my father, myself, or fact witnesses, and family members would attempt to provide him with information about my father's case, or the government accusations.  When Joey would question him about information provided by the government or attempt to disclose facts rebutting them, he would become highly irritable and defensive when I would inquire what he was doing or asked him to investigate matters.

Defendant Cepeda Cortes daughter, Miriam Cepeda, traveled with Defendant to Mexico subsequent to victim Chapa's death.  Campano testified he and Jesus Ledezma, met with Defendant after Chapa's death in Mexico and the three concocted an alibi defense.  My sister Miriam Cepeda was never interviewed by attorney Rogers competently or thoroughly.  Miriam could and would have testified her father Cepeda Cortes only traveled to Mexico two times

**8**

subsequent to Chapa's death and prior to his arrest and that both times Miriam and her sister Laura Cepeda traveled with defendant Cepeda Cortes.  The Defendant did not meet with or converse with Jesus Campano and that Campano was only briefly seen at a family function, Campano did not have contact with Cepeda Cortes. Despite being put on notice that Campano would testify for the government and being in possession of government discovery, attorney Rodgers never inquired, consulted, or interviewed fact witnesses that had factual information that would have contradicted Campano and cast doubt as to the veracity of the cooperating co-conspirator Campano claims regarding Defendant.  Had Rogers taken the time and diligently interviewed Miriam he would have been aware Campano was lying. However, that critical bit of information was never presented to the jury.

Laura Cepeda, defendant Cepeda Cortes daughter, also traveled with Miriam Cepeda and her father to Mexico subsequent to Chapa's death and would and could have provided specific factual details controverting cooperating co-conspirator's Campano testimony in trial.  Laura Cepeda was never interviewed by attorney Robert Rogers, nor in trial did he ask any questions of her or attempt to illicit facts that would have rebutted Campano untruthful testimony.

Gilbert Garza a police officer in the McAllen community, Gilbert Garza was never interviewed or investigated by Rogers.  Campano lied in trial that the three co-conspirators found victim Chapa in Southlake Texas as a result of pictures and information provided by a McAllen cop a.k.a. Gilbert Garza to defendant Cortes Cepeda. Gilbert Garza was interviewed by F.B.I. and not charged.  He was available as a witness to rebut Campano testimony, but was never interviewed or called as a witness at trial.

Hugo Resendez was employed by my father, Defendant Cepeda-Cortes in his Decal BY Design Shop all in one stop signs/ Computer Repair/ Networking and Surveillance Camera. Despite family members identifying witness Hugo Resendez to Rogers as potential witness for the Defendant, Rodgers never interviewed or investigated witness Hugo to determine if he had information relevant to my father's defense. Witness Resendez was not subpoenaed or identified by Rodgers as a defense witness. Hugo Resendez had information that co-conspirator Ledezma and Campano were sophisticated and knowledgeable in their understanding and operation of computers and had frequent unsupervised access to Defendant's computers located at Defendant's business. Campano and Ledezma had operated and used it unbeknownst and unauthorized by Defendant. These witnesses had information rebutting government accusations, rebutting testimony offered by F. B. I. agents, and false testimony provided by Campano and Ledezma would have been heard by the jury.

The government in discovery provided attorney Robert Rogers information on the identity and general location of Elena Gonzalez. She had information relevant to victim Chapa's criminal activities, and status as "defacto boss of the Gulf Cartel." Rogers also had filed an Alternative Perpetrator Defense Motion and Witness Gonzalez was a fact witness supporting Cepeda-Cortes defensive theory. In fact, evidence not presented at trial support Chapa was in fact greatly involved in criminal activities, and the defacto leader of the Gulf Cartel. (See second sealed Affidavit.) Chapa had many enemies that wanted him dead. Evidence testified at trial by either Campano or Ledezma indicate other individuals were looking for Chapa in addition to Rodolfo Villareal aka "El Gato." Subsequent to the jury verdict, two F.B. I. 302 reports provided to my father Cepeda-Cortes appellate attorneys evidence the Zetas, not Gato had killed Chapa. Attorney Rogers never timely contacted, interviewed, or subpoenaed Gonzalez to trial.

**10**

Joey Cepeda could have provided relevant testimony supporting his father's innocence, lack of knowledge, and provided information and specifics how Ledezma and Campano tricked and took advantage of his father and secreted the true purpose of the conspiracy from the Defendant.  Despite having this information and representing to his father, family and himself that he would testify, attorney Rogers did not call him to the stand.

Rogers failed to communicate with the Defendant, about Counsel's decision not to call his son Joey as a defense witness.  Cepeda's family was anticipating Joey being called as a witness, including his father.

Some relevant excerpts from Laura Lynette Having's affidavit are as follows:

My cousin Campano testified at trial that he, my cousin Ledezma, and my father met in Mexico after victim's death and allegedly fabricated an alibi defense. This is untrue.  My father went to Mexico only twice after the shooting.  Both myself and my younger sister Miriam accompanied him.  The three of us stayed at the Holiday Inn and our trips were brief. On one occasion, we did see Campano briefly at a family dinner at the Rey Del Cabrito restaurant.  I was sitting next to my father at the dinner for the whole time Attorney Rogers spent more time and effort discussing the need for my father to accept a plea agreement than interviewing me on the many details and circumstances pertaining to the Mexico trips with my father, post victim's death.  Later, in the trial after a few of us had testified, Attorney Rogers met with the family.

Some relevant excerpts from Sandra McLean's affidavit are as follows:

There were times witnesses and family members would attempt to provide him with information and he would appear to be disinterested and often cut us off.  There was a lot of information pertaining to my brother's case that never came out at trial or was heard by the jury. Though a number of us testified in trial, Mr. Rogers never asked us pertinent questions about

<u>11</u>

significant facts we knew that would have countered the government's accusations and supported by brother.

Some relevant excerpts from Miriam Michelle Cepeda's affidavit are as follows:

Neither he, (Robert Rogers) nor anyone else, interviewed me extensively regarding my father's case.  I was called to testify in the trial, but Mr. Rogers never asked me questions or elicited information that I believe was crucial to my father's case. He did not thoroughly inquire about the trip to Mexico I took with my sister Laura Cepeda and my father, after Mr. Chapa was killed.

After my cousin Jesus Campano testified in trial, regarding my father traveling to Mexico after Chapa was killed, and testified he met with my father and they concocted an allege alibi, my sister and I told Mr. Rogers how that was not true and that we were with my father the whole time and only saw Jesus Campano briefly at a family dinner.  Rogers seemed surprised, scared and got angry and said we never told him.  He would always make excuses and seemed to blame others.

My brother was adamant he wanted to testify.  Joey was more knowledgeable about my father's case by far than anyone in our family.  He had a lot of first-hand knowledge of facts that could have shown the government's allegations against my father were false and my cousin Jesus Campano was not telling the truth; not to mention many other details that indicated a lot of what the government's witnesses were saying was not accurate or true.

Some relevant excerpts from Rosa Madrigal's affidavit are as follows:

In trial, our family, many who were to testify sat outside the courtroom.  After the government was finished with their case, we were extremely concerned and upset. We still

**12**

remained hopeful because Rogers had told us my brother's son Joey would testify and he and my brother knew more about the government charges than anyone.

On another occasion during trial, after my cousin Jesus Campano testified for the government, Mr. Rogers met with us. My brother's daughter Miriam was astounded when she learned Campano testified that he and my cousin Jesus Ledezma and my brother had met in Mexico after the victim was shot and testified the three agreed to some type of story if they were ever questioned. Miriam was upset and told Mr. Rogers my cousin Jesus Campano was lying, and that she had been with my brother when he traveled to Mexico after Mr. Chapa was killed and my brother had not even spoke with Campano.

Trial counsel did not effectively investigate material witnesses concerning facts that would contradict the government's witnesses and co-defendant Ledezma Campano.  This defensive theory would directly contradict the government's theory that the Defendant was a co-conspirator as alleged in the indictment.

Movant has filed a motion to file under seal a second affidavit in support of his claim that Elena Gonzalez was a critical and crucial witness for the defense. Movant's trial counsel failed to properly investigate, interview and subpoena her for trial. The second sealed affidavit, whether allowed to be filed under seal or not, will be filed in support of this 2255 motion. The request to file under seal is supported by the commonly known and obvious fact that potential witnesses (even citizens of this country) with knowledge of cartel activities are potential murder victims.

The second unsealed affidavit in summary shows the following facts in support of this motion:

  (1) Senor Chapa was the lawyer for the Gulf Cartel and personal attorney for Osiel Cardenas;
(2) the Zetas Cartel was seeking to kill Senor Chapa and had kidnapped members of his family;

**13**

(3) Senor Chapas wife told me that Chapa was a high-level informant for the U.S. government and that she and her husband feared for their lives because the Zetas were aware that Mr. Chapa was a U.S. government informant; (4) at some point probably on or about the year of 2013 in of May many people in our hometown became aware Senor Chapa had been murdered in the U.S.A.  I personally overheard conversations by Los Zetas members discussing how they had killed Senor Chapa.  Los Zetas members were amused that the U.S. government was blaming another cartel called the Beltran-Leyva Cartel and specifically a man named Gato for killing Mr. Chapa. These members of the Zetas stated Gato and Beltran Leyva cartel wanted to kill Mr. Chapa, but they had got to him first; (5) though I was fearful of being involved, I could have testified and would have to the information I now provide in this affidavit.

Trial counsel did not communicate with Movant as to which of the witnesses should be called to testify for the Movant. This action alone considering the facts provided by the witnesses' affidavit supports a prejudice prong required under the case of *Strickland v. Washington*, 466 U.S. 668 (1984)

Trial counsel did not consult with the Defendant/Movant and receive his approval to not call each one of the listed witnesses which would have explained and or contradicted in a material way the testimony of most of the government's witnesses.

Some relevant excerpts from Movant's affidavit are as follows:

I never realized or knew my cousin was working for a criminal organization or that the purpose of locating Mr. Chapa was to harm him. I would ask him to investigate many of the untruths the government was alleging.  Routinely he would not listen.  Often, he became highly defensive when I would question what he was working on.  I terminated his employment on at least two occasions and did so in writing.  The first time he threatened me and always attempted

**14**

to intimidate me.  On one occasion I told him "the F.B.I. was not telling the truth" and identified what the true facts were and in fact identified factual witnesses who would contradict the governments facts.  He responded by telling me "the F.B.I. never lies."  He also incredulously told me he was good friends with Mr. Burgess, the U.S. Attorney and rather than defending me always took Mr. Burgess position.  On that date I fired him and told him I did not want to see him again. He laughed and stated I was not getting a penny in a refund and stated, "he was one of the best attorneys in the country and was a board-certified criminal law expert." Our relationship had deteriorated to the degree he would not communicate with me directly.

Movant has shown that counsel's failure to investigate key evidence was ineffective assistance of counsel that prejudiced his right to a fair trial considering he received a sentence of life without parole. *Couch v. Butler,* 632 F2d 24, (6th Cir., 2011), *Simms v. Livesay*, 970 F2d 1575 (6th Cir.1992), *Baylor v. Estelle*, 94 F3d 1321 (9th Cir. 1996), *Soffar v. Dretke*, 427 F3d 286 (5th Cir. 2005)

### Movant's Reply to Government's Response to Ground No. 3

A review of the affidavit of the Defendant shows that trial counsel rarely personally visited the Defendant while he was incarcerated.  When he did, trial counsel would become agitated and angry and not talk to the Defendant.  Often, he would not listen to any statements that identified mistakes, inaccuracies, and untruths contained in the government's discovery.  He became highly defensive when he was questioned about what he was working on. His employment representing the Defendant was terminated twice in writing.  Defendant was threatened by counsel in an attempt to intimidate the Defendant. Defendant was told by counsel that the FBI always told the truth.

**15**

The government's response to Movant's claim there existed a conflict of interest that undermined the attorney-client relationship that resulted in a claim of ineffective assistance of counsel fails to address Movant's specific statements in his affidavit. Movant's specific statements in his affidavit that counsel's demeanor when discussing Movant's defense, disregard of Movant's claims of untruths and inaccuracies in the government's case, the attempted termination of counsel's representation, threats of intimidation by counsel against Movant, counsel's acceptance that FBI agents do not lie; where common knowledge knows differently, and counsel's 'good' friendship with the prosecutor.  This is another reason why an evidentiary hearing would fully develop contradictory facts that would allow Movant to fully present evidence in support of his claims.

Movant's Reply to Government's Response to Ground No. 4

There existed numerous witnesses available to rebut co-conspirator Campano's testimony.  Trial counsel's failure to investigate these witnesses and have competent command of material facts in an ineffective cross examination of the government's co-operating witness, Ledezma-Campano.

Movant's relying on Movant and his son's affidavit shows that there were witnesses available to rebut Ledezma-Campano's testimony:

1. Miriam Cepeda, daughter to movant; 2. Laura Cepeda, daughter to movant; 3. Gilbert Garza, McAllen Police Officer; 4. Hugo Recendez, Employee of Movant; 5. Elena Gonzalez 6. Joey Cepeda-Cortes, Jr., son of movant; 7.  Two affiants in each sealed affidavit.

Movant's Reply to Government's Response to Ground No. 5

Movant relies on the facts in supporting affidavits filed with the 2255 Motion and the two sealed affidavits to support his claims when trial counsel failed to call potential witnesses Gilbert

**16**

Garza, Miriam Cepeda, Laura Cepeda, Hugo Resendez and Elena Gonzalez, Joey Cortes and the Defendant as defense witnesses.  The affidavits, sealed and unsealed, show that material facts were shown in the affidavits that would provide factual rebuttal to the government's allegations as previously discussed herein.

In reply, Movant submits that the government repeatedly claims that trial counsel could have or did actions are trial strategy without any supporting affidavit of counsel. This is a very important reason for this Court to schedule and conduct an evidentiary hearing so that each party can fully litigate conflicting material facts underlying Movant's claims and the government's response.

*See Rutland v. State*, 415 S.C. 570 (2016) an opinion by the South Carolina Supreme Court that discuss a failure to adequately cross examine is deficient performance that prejudiced defendant's case.

Movant's Reply to Government's Response to Ground No. 6

A review of the trial testimony shows that near the end of testimony when trial counsel was presenting the defense, he told the family the defense needed no other defense witnesses and he had stipulated with the government that the Defendant played a minor role in the alleged conspiracy. This was a critical error, because any involvement in the alleged conspiracy would make the Defendant guilty and there were other defense witnesses that could rebut the State's case in chief.

Movant claims that trial counsel misrepresented to the Movant and his family that no other defense witnesses would be needed to testify for Movant, because he had stipulated with the prosecution that Defendant played a minor role in the alleged conspiracy.  Any involvement in a conspiracy would make a defendant guilty, but this was not told to the Movant or his family.

**17**

The statement to the family being a misrepresentation was designed to advise Movant and his family that the government's evidence was insufficient to sustain a conviction and no other testimony was necessary. A review of the trial testimony up to this point in the trial was devastating and required an adequate rebuttal to have a fair jury weighing and determining the evidence and whether the government proved its case beyond a reasonable doubt.

Movant's Reply to Government's Response to Ground No. 7

A review of the Appellant's brief in direct appeal to the Fifth Circuit Court of Appeals shows the Appellate counsel only raised one issue as to severance.  The Defendant believes that Appellate counsel should have raised issues related to the trial court overruling objections to inadmissible 404 b evidence of extraneous offenses, the denial of Defendant's alternative suspect theory and sufficiency of the evidence.

Movant submits that Appellate counsel rendered ineffective assistance of counsel on appeal, because he did not challenge the admission of 404b evidence, material issues and the sufficiency of evidence.  An objection was strenuously put forth against the government's attempt to use extraneous 404 b evidence. As the government previously noted that the defendant basically gets one shot at challenging trial issues on direct appeal and not through post-conviction 2255 motions or writs of habeas corpus.  Therefore, Movant argues that it was imperative that appellate counsel raise these issues on direct appeal. The 404-b evidence was extremely prejudicial to Movant as it allowed the government to present evidence of extremely prejudicial murders that Movant was not associated to harm him through his relatives in Mexico and their cartel exploits.

**18**

*See Mapes v. Croyle*, 171 Fed 408 (6th Cir. 1999) for discussion on factors considered in issue of ineffective appellate counsel on appeal. Also, *Matire v. Wainwright*, 811 F. 2d 1430 (11th Cir. 1987).

### Movant's Reply to Government's Response to Ground No. 8

Defendant wanted to testify, but trial counsel did not call him as a witness.  Defendant was not adequately and effectively advised of whether he should or should not testify in his defense.

A defendant's right to testify is personal to him and not counsel citing *Parker v. Arkansas* 483 U.S. 44 (1987). It is submitted that this right of being personal to the defendant extends to the presentation of his defense and how it is conducted through defense witnesses to be called at trial.  The government attacks Movant's affidavit with assumptions that Movant knew of his right to testify, because other defendants were admonished during the trial.  This assumption is not supported by any affidavit of counsel; which would be very important in any defendant's attorney client relationship.  Any admonishment should be directed to the defendant personally since the right to testify and present a defense involves any defendant's relationship with his defense attorney.  This is another important reason for this Court to schedule and conduct an evidentiary hearing.  Movant would be denied due process of law if he is denied an opportunity to fully testify about his claims. Trial Counsel made the decision not to call the Defendant as a witness.  The Defendant did not give his consent to this decision.

### Movant's Reply to Government's Response to Ground No. 9

Defendant refers this Court to the trial testimony at which trial counsel called the expert as a defense witness but was not allowed to testify by the trial court.

**19**

Movant's affidavit supports this claim that had trial counsel adequately prepared for trial in presentation of Dr. Al Yovonvitz's expert testimony he would have been able to overcome the Court's ruling that the 'tests' were made on a duplicate model recording device rather than the original. This ground is important because Movant should have been allowed to be able to fully present the entire recording of his interview with government agents.

Movant's Reply to Government's Response to Ground No. 10

Movant has newly discovered evidence from witnesses first and second sealed indictments that co-defendant, Ledezma-Campano, admitted he lied to the jury about movant-defendant's involvement in each count of the indictment so save himself and his father.

Movant filed under seal an affidavit of a witness who had personally conversed with Campano, and a second sealed affidavit. The first sealed affidavit showed that "Joe Cepeda Cortes" just got caught up in something he didn't know anything about.  He did not know anything about who Ledezma and his son Campano really were and what they were doing. Campano stated to witness he did anything and said anything to save himself and get out.  Joe Cepeda Cortes had just been a "patsy." Campano told the police what they wanted to hear and that is what he did.  Campano admitted to the affiant that he led and fed law enforcement what they wanted. Campano admitted most of his trial testimony was untrue to get a good deal.   The second sealed affidavit shows that the 'Zetas' killed Chapa and that there is no evidence in the trial record that the Defendant was part of the 'Zetas' murdering Chapa.

Movant's Reply to Government's Response to Ground No. 11

Based on a review of post-trial F.B.I. 302's supplied to Defense counsel after trial and the two sealed affidavits it appears that Defendant Cepeda-Cortes was not involved in the murder of

**20**

the victim Chapa or involved with those who actually planned, carried out the shooting and murder of the victim, Chapa, and therefore, Defendant is innocent of the charges in this matter.

## CONCLUSION

The Court should provide an evidentiary hearing for movant as fact issues have been adequately raised that need to be further developed by live witnesses.  The Court should grant movant's application as to any one ground or in the alternative movant submits that the cumulative effect of the alleged deficiencies resulted in ineffective assistance of counsel that had a cumulative prejudicial effect.  *See Harris By and Through Ramseyer v. Wood*, F.3d 1432 (9th Cir. 1995) and *Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992).

/s/ Mark A. Hoak
Mark Alan Hoak
Texas Bar Card: 09736520
Law Office of Mark A. Hoak
1307 B. W. Abram St. Suite 100
Arlington, Texas 76013
Email: markhoak@gmail.com
Telephone Number: (817) 740-8900
Facsimile Number: (214)732-5964
Attorney for Defendant
JOSE CEPEDA-CORTES

## CERTIFICATE OF SERVICE

I, Mark Hoak, hereby certify that on January 5th, 2021 a copy of the foregoing notice was delivered by ECF to Gail Hayworth, the assigned AUSA at the United States Attorney's.

/S/ Mark A. Hoak
Mark Alan Hoak
Counsel for Cepeda-Cortes

**21**